## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 30 2016, 9:18 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT S.B.
Erin L. Berger
Evansville, Indiana

ATTORNEY FOR APPELLANT T.W.
Thomas G. Krochta
Vanderburgh County Public Defender
Evansville, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the Parent-Child Relationship of J.D. and T.M. (minor children)

and

S.B. (Father) and T.W (Father),

*Appellants-Respondents,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

September 30, 2016

Court of Appeals Case No.
82A01-1602-JT-457

Appeal from the Vanderburgh Superior Court

The Honorable Brett J. Niemeier, Judge

The Honorable Renee A. Ferguson, Magistrate

Trial Court Cause Nos.
82D04-1509-JT-1678
82D04-1509-JT-1679

**Mathias, Judge.**

[1] The Vanderburgh Superior Court entered an order terminating the parental rights of S.B. to his son J.D. and of T.W. to his son T.M. In this consolidated appeal, S.B. presents two issues, which we restate as: (1) whether the trial court abused its discretion in denying S.B.'s motion for a continuance, and (2) whether the trial court's termination order is supported by sufficient evidence. T.W. presents one issue, which we restate as whether the trial court's termination order is supported by sufficient evidence.

[2] We affirm.

## Facts and Procedural History

[3] The first child at issue in this case is J.D., who was born in August 2009 to K.M. ("Mother") and S.B. The other, younger child is T.M., who was born in January 2014 to Mother and T.W.

*A. Facts Regarding S.B. and J.D.*

[4] At the time of J.D.'s birth, S.B. was on work release due to his 2010 convictions for Class D felony possession of marijuana and Class D felony maintaining a common nuisance. When J.D. was approximately three months old, S.B. "ran" and failed to return to incarceration. Tr. p. 48. S.B. was eventually apprehended and convicted for failing to return to detention, resulting in further incarceration. S.B. testified that for both of these charges he served eighteen months. Shortly thereafter, in April 2011, S.B. was again arrested and subsequently convicted for Class D felony possession of marijuana. S.B. testified that he was released on these charges in August 2012. On September

13, 2012, S.B. pleaded guilty to Class C felony battery causing serious bodily injury and was sentenced to a term of two years in the Department of Correction ("DOC"). In November 2012, S.B. was indicted by a federal grand jury for being a felon in possession of a handgun. S.B. pleaded guilty to this charge. Thus, S.B. was, as he admitted "locked up" for most of the first three years of J.D.'s life and "out of [J.D.]'s life, pretty much his whole life." Tr. p. 180.

[5] S.B.'s employment history was, at best, sporadic. He was last employed in 2008, when he worked for approximately six months. He lost this job as a result of a 2009 arrest and subsequent conviction for illegal consumption of alcohol. During the brief periods of time that he was not incarcerated, S.B. was not employed.

[6] During the four months in 2010 – 2011 when S.B. was not incarcerated he admitted that he was able to see J.D. any time he wanted. However, he only saw the child for a total of four to five hours during this period. During the two months he was not incarcerated between August and November of 2012, S.B. saw J.D. a "few" times. Tr. p. 58. S.B. had not seen J.D. in the intervening three years. It comes as no surprise then that J.D. rarely spoke about his biological father. Indeed, J.D. calls his foster father "dad," and he refers to S.B. by his first name. Tr. p. 118. During therapy, J.D. mentioned S.B. only when prompted, telling the therapist that his biological father had done "bad things" and that J.D. "doesn't see him." Tr. p. 117.

On August 1, 2013, J.D. was living with Mother and T.W. in Evansville. On that date, a fire broke out at the home. During the subsequent investigation, the police found evidence of a methamphetamine lab, and both Mother and T.W. were arrested.

The Indiana Department of Child Services ("DCS") took J.D. into custody and filed a petition alleging that J.D. was a child in need of services ("CHINS") on August 6, 2013. At the August 13, 2013 initial hearing, S.B. stipulated that J.D. was in need of services, and the trial court entered an order adjudicating J.D. to be a CHINS. The court ordered S.B. to sign releases for J.D.'s medical information, contact the DCS family case manager when assigned to federal prison, and contact the FCM when released from prison.

In January 2014, during the course of the CHINS action, the Court Appointed Special Advocate ("CASA"), Debbie Gamache, sent a letter to S.B. while he was incarcerated. She again wrote S.B. in January and July of the following year. S.B. never responded to the CASA's letters, nor did he otherwise try to contact her, even though her contact information was in the letters she sent. S.B. did contact DCS family case manager Katie Melton in September 2015 to ask about Mother and the CHINS case. At this time, S.B. asked for the address of J.D.'s foster parents, but Ms. Melton stated that she could not give this address without the foster parents' consent, which they declined to give. Father made no other effort to contact J.D.

[10] S.B. testified that, while incarcerated, he took affirmative steps to improve his life, even though DCS could not provide services to him due to his incarceration. Specifically, S.B. testified that he had completed a victim impact class and a substance abuse class. However, the substance abuse class consisted of only twelve hours over two days. S.B. also testified that, at the time of the termination hearing, he was in week seven of a twelve-week parenting class.

[11] At the time of the termination hearing, held on November 23, 2015, S.B. was still incarcerated at a federal prison in Kentucky, serving a sentence for the crime of possession of a handgun by a felon. Father self-reported a release date of March 14, 2016, but also indicated that he would have to remain in a work-release center for two more months following his release.

*B. Facts Regarding T.W. and T.M.*

[12] T.M. was born in January 2014 to Mother and T.W. while Mother and T.W. were incarcerated as a result of the methamphetamine lab found in their home. After T.M. was born, DCS filed a petition alleging that he was a CHINS due to his parents' incarceration. At the initial hearing, T.W. failed to appear, and based on Mother's stipulation, the trial court found T.M. to be a CHINS.

[13] As a result of the fire and discovery of the methamphetamine lab at his home, T.W. pleaded guilty on August 14, 2014 to Class B felony conspiracy to commit

dealing in methamphetamine and Class C felony neglect of a dependent, i.e. J.D. T.W. was sentenced an aggregate term of eight years.[1]

[14] T.W. has been incarcerated for the entirety of T.M.'s life. He has not met T.M. nor attempted to make any contact with the child. T.W. admitted that he and T.M. do not have "much of a bond." Tr. p. 94. T.W. contacted DCS case manager Melton a few months before the termination hearing and requested DNA paternity testing because he was not sure if T.M. was his biological child. T.W. did email the CASA, but his contact with her focused on the services he was participating in while in prison. He never asked the CASA about T.M. and never asked for her help in contacting him.

[15] DCS could not offer services to T.W. due to his incarceration, but he did participate in some services offered by the DOC. He was in the "Plus" program but was moved to the "Provident Man" program due to unruly behavior. He completed the Provident Man program and was readmitted to the Plus program. T.W. also participated in the "DOL" program, working as a barber. He expected to complete the DOL and Plus programs in February 2016. T.W.

---

[1] This was not T.W.'s first conviction. T.W.'s criminal history extends back to 2009, when he was convicted of three counts of burglary. Although he was sentenced to work release, he violated the terms of his release in 2010 and served the remainder of his sentence in the DOC. T.W. was convicted again in 2011 of unlawful possession of a firearm and possession of methamphetamine. He subsequently violated his probation in this case and served one year of incarceration. In 2012, he was convicted of two counts of misdemeanor resisting law enforcement. Then in 2013, he was convicted of Class D felony theft and Class D felony attempted theft and sentenced to eighteen months of home detention and eighteen months of probation. He later violated his probation and served 200 days in jail.

testified that if he received credit for completing these programs, his release date would be moved from January 2018 to January 2017.

[16] As a result of T.W.'s repeated convictions and incarceration, he had not maintained stable housing, but he did have a job prior to his most recent incarceration. He hoped to live with his father after his release and start working again at his old job, but he had not yet contacted his former employer.

[17] Because both Mother and T.W. have been incarcerated since before he was born, T.M. has spent most of his life away from his biological parents. He has been placed with his current foster family since he was only four months old.[2] J.D. was later placed with the same foster family, and the two brothers have grown very close. T.M. was also closely bonded with his current foster family.

[18] On September 22, 2015, DCS filed petitions to terminate the parental rights of Mother, T.W., and S.B. The trial court held an evidentiary hearing on the termination petitions on November 23, 2015. The trial court entered orders terminating the rights of the parents of both children on February 9, 2016. T.W. and S.B. filed separate appeals, which were later consolidated into this appeal.[3] Additional facts will be provided as necessary.

---

[2] T.M. was placed with Mother for a trial visit on February 20, 2015, but this trial was terminated on March 18, after Mother tested positive for methamphetamine. T.M. was then returned to his current foster family.

[3] Mother is not a participant in the current appeal.

# I. S.B.'s Appeal

S.B. presents two issues on appeal: (1) whether the trial court abused its discretion in denying his motion for a continuance, and (2) whether DCS presented sufficient evidence to support the trial court's order terminating his parental rights to J.D. We address each of these arguments in turn.

## A. S.B.'s Motion for a Continuance

S.B. argues that the trial court erred in denying his motion to continue the termination hearing until after his release from incarceration. The decision to grant or deny a motion for continuance is within the sound discretion of the trial court. *J.P. v. G.M.*, 14 N.E.3d 786, 789 (Ind. Ct. App. 2014). We will reverse only for an abuse of that discretion. *Rowlett v. Vanderburgh Cnty. Office of Family & Children*, 841 N.E.2d 615, 619 (Ind. Ct. App. 2005), *trans. denied*. An abuse of discretion occurs where the trial court reaches a conclusion that is clearly against the logic and effect of the facts or the reasonable and probable deductions that may be drawn therefrom. *J.P.*, 14 N.E.3d at 790. Where the trial court denies a motion for continuance, an abuse of discretion will be found if the moving party has demonstrated good cause for granting the motion. *Rowlett*, 841 N.E.2d at 619; *see also* Ind. Trial Rule 53.5 (stating that trial court has discretion to grant continuance on motion and continuance "shall be allowed upon a showing of good cause established by affidavit or other evidence."). No abuse of discretion will be found where the moving party has not shown that he was prejudiced by the denial of his continuance motion. *J.P.*, 14 N.E.3d at 790.

S.B. cites *Rowlett* in support of his argument. In that case, we held that the trial court had erred in denying the incarcerated father's motion for a continuance. *Rowlett*, 841 N.E.2d at 619. In *Rowlett* we acknowledged that the father's request was based on his own incarceration, but we also noted that he was set to be released only six weeks after the scheduled hearing. *Id*. The father in *Rowlett* was therefore denied any opportunity to participate in services or demonstrate his fitness as a parent. *Id*. This result was particularly harsh because the father had participated in numerous services and programs offered by the correctional facility that were helpful to him in reaching his goal of reunification with his children. *Id*.

While this case and *Rowlett* have some similarities, they also have significant differences. First, S.B.'s release date was at least six months, not six weeks, away at the time of the termination hearing. Further, unlike the father in *Rowlett*, S.B. had no relationship with J.D., either before or during his incarceration. S.B. made minimal efforts to contact his son after he was incarcerated, and J.D. never spoke of his biological father. Although S.B. took advantages of some services while incarcerated, he had not yet completed the parenting skills class. In fact, S.B. himself testified that it would take up to one year after his release from incarceration for him to be able to have adequate housing for J.D. At the time of the termination hearing, J.D. had been a CHINS and in the custody of DCS for over two years. Under these facts and circumstances, we cannot say that the trial court abused its discretion by denying S.B.'s request to further delay the proceedings by at least six months, if

not longer, so that he could be afforded the opportunity to participate in services offered by DCS.

*B.  Termination of S.B.'s Parental Rights to J.D.*

[23] S.B. also argues that the trial court erred in terminating his parental rights to J.D. The purpose of terminating parental rights is not to punish parents but instead to protect their children. *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004). Although parental rights have a constitutional dimension, the law allows for their termination when the parties are unable or unwilling to meet their responsibility as parents. *Id*. Indeed, parental interests must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights. *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009).

[24] Indiana Code section 31-35-2-4(b)(2) provides that a petition to terminate parental rights must allege:

> (B) that one (1) of the following is true:
>
>> (i)   There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii)  There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and

> (D) that there is a satisfactory plan for the care and treatment of the child.

[25] DCS must prove each element by clear and convincing evidence. *G.Y.*, 904 N.E.2d at 1261; Ind. Code § 31-37-14-2. Because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the trial court is required to find that only one prong of subsection (b)(2)(B) has been established by clear and convincing evidence. *In re A.K.*, 924 N.E.3d 212, 220 (Ind. Ct. App. 2010).

[26] Clear and convincing evidence need not establish that the continued custody of the parent is wholly inadequate for the child's very survival. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). It is instead sufficient to show by clear and convincing evidence that the child's emotional and physical development are put at risk by the parent's custody. *Id.* If the court finds the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[27] On appeal, we have long had a highly deferential standard of review in cases involving the termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). We neither reweigh the evidence nor assess witness credibility. *Id.* We consider only the evidence and reasonable inferences favorable to the trial court's judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* Clear error is that which leaves us with a definite and firm conviction that a mistake has been

made. *J.M. v. Marion Cnty. Office of Family & Children*, 802 N.E.2d 40, 44 (Ind. Ct. App. 2004), *trans. denied*.

### 1. Challenge to Factual Findings

Interspersed with his arguments regarding the elements DCS was required to prove, S.D. also challenges several of the trial court's factual findings. Where the trial court enters findings of fact and conclusions thereon, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings and then determine whether the findings support the judgment. *In re D.B.*, 942 N.E.2d at 871.

S.B. first challenges the trial court's finding that "[S.B.] does not have a plan for employment upon his release from incarceration, and [S.B.] does not have an adequate plan for housing upon release." Appellant S.B.'s App. p. 15. S.B. claims that this finding is contradicted by his testimony that he planned to live with his mother upon release and that he had been "looking at jobs" and intended to attend Ivy Tech. Tr. p. 50. S.B.'s argument is little more than a request that we credit his testimony, which the trial court obviously discredited. This is not our role as an appellate court. *In re D.B.*, 942 N.E.2d at 871. Moreover, S.B. himself admitted that it would take up to a year for him to find adequate housing and that he did not have any immediate plans for housing that would be adequate to raise a child. Accordingly, the trial court's finding on this issue was not clearly erroneous.

[30] S.B. also challenges the trial court's finding that "he has not contacted or attempted to contact the child since his incarceration in Big Sandy Federal Prison." Appellant S.B.'s App. p. 16. Again, Father refers to his own testimony to challenge this finding, which the trial court was free to reject. We do note, however, that DCS case manager Melton testified that S.D. contacted her in September 2015 to ask for the address of J.D.'s foster parents. Ms. Melton explained that she could not give this address without the foster parents' consent, which they declined to give. Notably, this attempt at contact was made shortly before the termination hearing, and S.B. made no other effort to contact J.D. Although the trial court's finding may be in error to the extent that it states that S.B. made "no attempt" to contact J.D., the gist of the holding remains true: S.B. had no contact with his son while incarcerated and made what appears to have been only a token attempt to contact J.D. S.B. has not established reversible error with regard to this finding.

[31] Lastly, S.B. claims that the trial court erred in finding that "Family Case Manager, Katie Melton, testified that there are no services that DCS could offer to enhance [S.B]'s ability to remedy the reason the child has been out of the home." *Id*. at 17. S.B. notes that DCS case manager Cyromia Hughes-Love testified that DCS could have offered services to S.B. However, S.B. appears to ignore the fact that Ms. Hughes-Love explained that the reason that DCS had not offered such services was because S.B. was incarcerated. It is well settled that DCS is not required to offer services to a parent while the parent is incarcerated. *Rowlett*, 841 N.E.2d at 622; *see also In re H.L.*, 915 N.E.2d 145, 148

(Ind. Ct. App. 2009) (holding that father was not denied due process of law where DCS was unable to offer services to father or evaluate him for services due to his incarceration). Thus, the trial court's finding regarding services is not clearly erroneous.

*2. Conditions Resulting in J.D.'s Removal or Placement Outside Parents' Home*

[32] In addition to attacking certain of the trial court's factual findings, S.B. also claims that the trial court clearly erred in finding that the conditions that resulted in J.D.'s removal or placement outside the parents' home would not be remedied.

[33] When deciding whether there is a reasonable probability that the conditions resulting in a child's removal or continued placement outside of a parent's care will not be remedied, the trial court must determine a parent's fitness to care for the child at the time of the termination hearing while also taking into consideration evidence of changed circumstances. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156-57 (Ind. Ct. App. 2013). However, the trial court may disregard efforts made only shortly before termination and weigh more heavily a parent's history of conduct prior to those efforts. *In re K.T.K.*, 989 N.E.2d 1225, 1234 (Ind. 2013).

[34] Here, the reason for J.D.'s removal and placement outside the home of the parents was S.B.'s incarceration. More specifically, when Mother was incarcerated, S.B. was unable to take custody of J.D. because he was already incarcerated. S.B. argues that his pending release from incarceration and the

services he participated in while incarcerated would remedy the conditions which led to J.D.'s removal and his placement with the foster parents. In so doing, however, J.D. relies in large part on his own testimony and other evidence that does not favor the trial court's judgment. Of course, on appeal, we may not consider this evidence and may consider only the evidence favorable to the trial court's judgment. *In re D.B.*, 942 N.E.2d at 871. Considering only the evidence favorable to the trial court's judgment, we are unable to conclude that the court clearly erred in determining that DCS had met its burden.

[35]     S.B. has been incarcerated for the majority of J.D.'s short life. As noted above, S.B. was on work release when J.D. was born but fled from the work release program when J.D. was approximately three months old. When S.B. was apprehended thereafter, he was sentenced to further incarceration. S.B. was arrested shortly after his 2012 release from these charges and ultimately convicted and sentenced to more incarceration. Then in 2013, he was again convicted and sentenced to two years in the DOC. As found by the trial court:

> [S.B] has pleaded guilty to five (5) felonies and the State has filed three (3) Petitions for Revocation on [S.B.] in the past six (6) years. [S.B.] has been incarcerated for three (3) of the past six (6) years. . . . [S.B.]'s longest span of time outside of incarceration since turning eighteen (18) years of age is six (6) months.

Appellant S.B.'s App. p. 15.

S.B. has a history of repeated criminal behavior, violation of probation, and an inability to abide by the law, resulting in his frequent incarceration. Under these facts and circumstances, the trial court did not clearly err in determining that there was a reasonable probability that the conditions which led to J.D.'s removal or placement outside the parents' home, i.e. S.B.'s repeated incarceration, would not be remedied.

*3. Continuation of Parent-Child Relationship*

S.B. also asserts in his brief that "DCS failed to prove by clear and convincing evidence that . . . the continuation of the parent-child relationship poses a threat to the well-being of the child[.]" Appellant S.B.'s Br. p. 17. However, S.B. fails to develop this argument any further. Accordingly, we consider it waived for failure to make a cogent argument. *See In re Adoption of M.S.*, 10 N.E.3d 1272, 1282 (Ind. Ct. App. 2014) (citing Ind. Appellate Rule 46(A)(8)(a)).

Moreover, as noted above, Indiana Code section 4(b)(2)(B) is written in the disjunctive, and the trial court is required to find that only one prong of subsection (b)(2)(B) has been established by clear and convincing evidence. *In re A.K.*, 924 N.E.3d at 220. Because we have affirmed the trial court's conclusion that one prong of subsection (b)(2)(B) was proven by DCS, we need not address the other prong.[4]

---

[4] The reverse is also true. Because S.B. has waived his challenge to the threat prong, we need not address his challenge to the conditions prong. Still, we have attempted to address all of Father's arguments on the merits,

[39] Waiver notwithstanding, ample evidence supported the trial court's conclusion that the continuation of the parent-child relationship between S.B. and J.D. posed a threat to J.D.'s well-being. In addressing this issue, we note that the trial court must consider the parent's habitual patterns of conduct in order to determine the probability of future neglect or deprivation of the child. *A.D.S.*, 987 N.E.2d at 1157. The trial court may consider evidence of a parent's prior history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* DCS is not required to provide evidence ruling out all possibilities of change. *Id.* Instead, it needs to establish only that a "reasonable probability" exists that the parent's behavior will not change. *Id.*

[40] Here, there was evidence from which the trial court could reasonably conclude that the continuation of the parent child relationship between S.B. and J.D. posed a threat to J.D.'s well-being. S.B. had been incarcerated for the better portion of J.D.'s life. During the few months of J.D.'s life during which S.B. was not incarcerated, he had minimal contact with his son, and S.B. himself admitted that he was "out of [J.D.]'s life, pretty much his whole life." Tr. p. 180.

[41] In his young life, S.D. has lived with his Mother and T.W., his maternal grandmother, his first foster home, a failed home visitation with Mother, and now his current foster home, where he lives with T.M. As a result of this

as is our preference. *See Omni Ins. Grp. v. Poage*, 966 N.E.2d 750, 753 (Ind. Ct. App. 2012) ("We prefer to decide a case on the merits whenever possible.").

unstable life, S.D. has anxiety problems and is in counseling to address his anxiety. His therapists and case managers believed that removing S.D. from his current foster home would harm his emotional health. Under these facts and circumstances, the trial court was well within its discretion to conclude that the continuation of the parent-child relationship between S.B. and J.D. posed a threat to J.D.'s well-being.

### 4. Best Interests of the Child

[42]    S.B. again briefly claims that termination of the parent-child relationship was not in S.B.'s best interests. Yet again, he wholly fails to develop this argument with any cogent reasoning or citation to authority. As such, this argument is waived. *See In re M.S.*, 10 N.E.3d at 1282. Waiver notwithstanding, the evidence from which the trial court could reasonably conclude that termination of the parent-child relationship was in S.B.'s best interests was sufficient.

[43]    In determining what is in the best interests of the child, the trial court is required to look beyond the factors identified by DCS and to look to the totality of the evidence. *A.D.S.*, 987 N.E.2d at 1158. The trial court must subordinate the interests of the parent to those of the child, and the court need not wait until the child are irreversibly harmed before terminating the parent-child relationship. *Id*. Moreover, the recommendation by the case manager or child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests. *Id*.

[44] Here, both DCS case managers and the CASA recommended termination. In addition, as explained in more detail above, S.B. has never been a significant part of J.D.'s life, mostly due to his repeated criminal behavior and repeated incarceration. Even when he was not incarcerated, S.B. had little to do with his son. During his most recent incarceration, he made only minimal efforts to contact his son. J.D. does not consider S.B. to be his father and refers to him by his first name, whereas he calls his current foster father "dad." Tr. p. 118. S.B. has a sporadic job history and no immediate ability to care for S.B. even after he is released from jail. At the time of the termination hearing, J.D. had been in DCS custody for over two years. J.D. is doing well in his current placement with the same foster family as his younger brother T.M. The evidence demonstrated that separating the two brothers would be traumatic to both, and the foster family plans to adopt J.D.

[45] We cannot fault the trial court for rejecting S.B.'s request to make J.D. wait for months or years to see if S.B. suddenly and dramatically changes his behavior and becomes a responsible parent. The trial court did not clearly err in determining that termination of the parent-child relationship between S.B. and J.D. was in J.D.'s best interests.

[46] In short, DCS presented evidence sufficient to meet its burden of demonstrating that there was a reasonable probability that the conditions which led to J.D.'s removal and his placement outside the home of the parents would not be remedied, that the continuation of the parent-child relationship posed a threat to J.D.'s well-being, and that termination of the parent-child relationship was in

J.D.'s best interests. Accordingly, we affirm the trial court's order terminating S.B.'s parental rights to J.D.

## II. T.W.'s Appeal

[47] T.W. challenges the sufficiency of the evidence presented by DCS to support the termination of his parental rights to his son T.M. T.W. claims that the child's need for permanency is not reason enough to terminate parental rights "where the parent has an established relationship with his child and has taken positive steps toward reunification." Appellant T.W.'s Brief p. 7. T.W., however, does not have an established relationship with his child, and his steps toward reunification have been minimal.

[48] T.W. blames his lack of progress on his incarceration, citing *K.E. v. Indiana Department of Child Services*, 39 N.E.3d 641 (Ind. 2015). In that case, the father was charged with various criminal drug offenses while the mother was pregnant. Thus, at the time of the child's birth, the father was incarcerated, and his release date was over two years away at the time of the termination hearing. On appeal, our supreme court noted the positive steps the father had taken while incarcerated, which included: completion of twelve inmate programs, in addition to attending alcoholics anonymous and narcotics anonymous meetings; making plans for housing and employment upon release from incarceration; and maintaining frequent and meaningful contact with his child, including weekly visits with the child and calling the child every night to speak with him on the telephone. Under those facts and circumstances, our supreme court held that, even though father's release was at least two years in the future,

he had made "substantial efforts . . . to improve his life by learning to become a better parent, establishing a relationship with K.E. . . . , and attending substance abuse classes[.]" *Id*. at 649. Accordingly, the court reversed the termination order. *Id*.

[49] T.W. claims that his case is analogous with that in *K.E.* We disagree. Although *K.E.* and the present case have some similarities, the differences are substantial. First, the father in *K.E.* had made significant effort to better himself while incarcerated. He had completed twelve different programs that "particularly targeted parenting and life skills, along with addressing substance abuse." *Id*. at 649. In contrast, here, T.W. testified that he was in the Plus program but was removed as a result of his unruly behavior. He was moved to the Provident Man program, which he completed, but had yet to complete the Plus program.[5] He was also working as a barber in the DOL program. While we do not mean to diminish the positive steps T.W. has taken, his efforts fall short of the dramatic efforts taken by the father in *K.E.*

[50] More important is that the father in *K.E.* took great efforts to maintain a meaningful relationship with his child. Indeed, he visited with the child weekly and telephoned every night to speak with the child. As a result, the father and child in *K.E.* were bonded. In contrast, here, T.W. had not met T.M. or even made any attempt to contact him. It is therefore no surprise that they had no

---

[5] T.W. testified that he had completed 350 hours of community services, completed four elective classes, and nine out of twelve classes in the Plus program.

bond. Instead of attempting to contact his son, T.W. contacted the case manager and requested paternity testing to see if the child was his. T.W. did email the CASA, but he never asked the CASA about T.M. and never asked for her help in contacting him. For this reason, we do not find *K.E.* to be controlling here. *See In re A.G.*, 45 N.E.3d 471, 479 (Ind. Ct. App. 2015) (distinguishing *K.E.* upon the grounds that the father had not even met his child), *trans. denied*.

[51] T.W. also claims that the trial court committed clear error in finding that:

> [T.W.] does not have an adequate plan for the care of [T.M.] once he is released from prison. [T.W.] wants to live with his father, who has prior DCS substantiated history. [T.W.] also states he will get employment at one of his past jobs; however, [T.W.] did not present any evidence that the previous employers would be willing to offer him future employment. [T.W.] did not have a timeframe for establishing stability, including housing and employment, or a timeframe for establishing permanency for [T.M.]

Appellant T.W.'s App. p. 24.

[52] T.W. claims that this finding ignores his testimony that he would have housing with his father and planned to have a job within a week of his release. However, the trial court was not required to credit T.W.'s self-serving testimony. *See In re D.B.*, 942 N.E.2d at 871. Moreover, the trial court's finding acknowledges that T.W. planned to live with his father. However, T.W. testified that, although his father was often gone from home traveling, his twelve-year-old sister and his father's wife also lived at the house. He also admitted that he

and his sisters had been removed from his father's home in 2006 after the death of his younger brother. Because of this, DCS would not allow T.W.'s father to have custody of T.M. Moreover, although T.W. seemed confident that he would have a job upon his release, he admitted that he had not yet contacted any of his former employers to ensure that he would have employment upon his release. Under these facts and circumstances, we cannot say that the trial court's finding is clearly erroneous.

[53] T.W. sporadically argues that DCS failed to prove that there was a reasonable probability that the conditions that resulted in T.M.'s removal from the home or his placement outside the parents' home would not be remedied, that the continuation of the parent-child relationship posed a threat to the well-being of T.M., and that termination of the parent-child relationship between T.W. and T.M. was in T.M.'s best interests. T.W.'s argument, however, is limited to the grounds he presented above.

[54] Nevertheless, we conclude that DCS presented evidence sufficient to support the trial court's termination order. First, there was evidence supporting the trial court's determination that the conditions that resulted in T.M.'s removal or his placement outside the home of his parents would not be remedied. T.M. was removed because of Mother and T.W.'s criminal behavior that resulted in their convictions and subsequent incarceration. As detailed above, this latest conviction was just the latest in a long line of criminal behavior by T.W. Given T.W.'s history and his relatively inchoate plans for his housing and employment after his release, we cannot say that the trial court clearly erred in

concluding that the reasons for T.M.'s removal or his placement outside the home would not be remedied.

[55] Even if the evidence was insufficient to support the trial court's conclusion with this first prong of subsection (b)(2)(B), there was also sufficient evidence to support the trial court's conclusion that the continuation of the parent-child relationship posed a threat to the well-being of T.M. By his own admission, T.W. had never seen his son and had made no effort to contact him. As a result, the child has no bond with T.W. T.M. has spent the vast majority of his life in the care and custody of his foster parents, who he considers his parents. Case manager Hughes-Love testified that removing T.M. from his current foster family would be traumatic and devastating to the child. Case manager Melton testified that further delaying T.M.'s permanent placement would be damaging to him. From this evidence, the trial court could reasonably conclude that DCS met its burden of showing, by clear and convincing evidence, that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to T.M.'s well-being.

[56] Similarly, there was evidence from which the trial court could readily conclude that termination of the parent-child relationship was in T.M.'s best interest. Again, T.M. had lived almost his entire life in the care and custody of his foster family, to whom he was bonded. T.M.'s brother, J.D., also lived with the foster family, and the two siblings were closely bonded. Both the CASA and the DCS case managers testified that termination of T.W.'s parental rights was in T.M.'s

best interests. Therefore, the trial court's conclusion that termination of T.W.'s parental rights was in the best interests of T.M. is not clearly erroneous.

## Conclusion

The trial court did not abuse its discretion when it denied S.B.'s motion for a continuance. Also, the trial court did not clearly err in terminating the parental rights of S.B. to his biological son J.D., nor did the trial court clearly err in terminating the parental rights of T.W. to his biological son T.M.

Affirmed.

Robb, J., and Brown, J., concur.